# SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This action is currently pending in U.S. District Court Case Number 6:21-cv-00588-AA ("Action").  The parties to this Action are plaintiffs Donald Terrill, Nicholas Pando, and Michael Wesley, represented by Lynn Walsh and Thomas Zito; and defendants State of Oregon and Colette Peters, represented by Tracy Ickes White and Jill Conbere ("Parties").  The Parties have agreed to settle this Action for the consideration set forth in this Settlement Agreement and Release of Claims ("Agreement").

The terms of this Agreement are as follows:

**Settlement Payment:**  As consideration for plaintiffs' Release of Claims, and on behalf of the Released Parties described below, the State of Oregon, by and through the Oregon Department of Administrative Services/Risk Management ("Risk Management"), shall pay each named plaintiff an agreed-upon sum as follows ("settlement payment"):  Plaintiff Terrill will be paid the sum of ten thousand dollars [$10,000] and separately reimbursed in full for all payments made for his durable medical equipment that has accrued since Feb. 14, 2013, Plaintiff Pando will be paid the sum of eleven thousand forty dollars and ninety-eight cents [$11,040.98], and Plaintiff Wesley will be paid the sum of eleven thousand two hundred eleven dollars and forty-six cents [$11,211.46].  Risk Management shall also pay attorneys' fees and costs in the combined amount of six hundred and sixty thousand dollars [$660,000].  Those payments shall be made by check payable to "Disability Rights Advocates" within 30 days of a fully executed settlement agreement.  The effective date of this Agreement is the date on which it is fully executed.  IRS Form 1099s will be issued for the 2024 calendar year.

**Policy Changes:**  The Oregon Department of Corrections ("ODOC") has also agreed to engage in formal rulemaking procedures to change its administrative rules.  The Parties have agreed on the proposed amendments that are set forth in Exhibit 1 to this Agreement, which ODOC will put forward to initiate the rulemaking process no later than 90 days after the

Page 1 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

effective date of this agreement.  ODOC will promptly provide notice to Plaintiffs through their Counsel of notice of the initiation of the rulemaking process.  ODOC agrees to take all necessary steps required by state laws and procedures to try to effectuate those proposed amendments. The Parties further recognize that formal adoption and amendments of ODOC administrative rules require ODOC to comply with the applicable rulemaking procedures set forth in Oregon state law, including the Administrative Procedures Act (Oregon Revised Statutes, Chapter 183). The Parties understand and agree that applicable rulemaking procedures require ODOC to, among other things, provide public notice of proposed new and amended rules, and provide an opportunity for public comment.  In light of ODOC's duties to follow applicable rulemaking procedures, the Parties recognize that ODOC cannot guarantee or stipulate that the proposed rule changes in Exhibit 1 will be adopted as proposed, in whole or in any part.  Rather, the proposed rules may be accepted, rejected, or modified in whole or in part through the formal rulemaking process.

**Reimbursements/Debt Forgiveness for Certain Durable Medical Equipment (DME):**
ODOC agrees to forgive select current unpaid debt incurred by individuals who were in ODOC custody from April 1, 2019, to February 29, 2024, to purchase approved elective "durable medical equipment" (DME) (as described in Exhibit 1), including hearing-related devices. ODOC further agrees to reimburse those individuals currently in ODOC custody for select payments made from April 1, 2019, to February 24, 2024, toward debt incurred for the purchase of DME or toward direct purchase of DME.  The Parties understand that, in anticipation of the execution of this Agreement, ODOC has provided or will provide reimbursements in the amount of $77,041.13, and debt forgiveness in the amount of $38,622.33, and that no further reimbursement or debt forgiveness is contemplated in this Agreement.

**Plaintiffs' Release of Claims:**  In consideration for the above, plaintiffs, individually and on behalf of any heirs, executors, administrators, successors, agents, and assigns agrees to release, acquit, and forever discharge defendants and all those in interest with them, including

Page 2 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

the State of Oregon, the Oregon Department of Corrections, and all of their political subdivisions, agencies, departments, administrators, officers, current and former employees, agents, attorneys, and insurers (collectively "Released Parties"), from only the claims, demands, or causes of action that were asserted in this Action, against the Released Parties through the Effective Date of this Agreement.

The release, acquittal, and discharge described above ("Release") includes any claims against the Released Parties - including the Oregon Department of Justice and Risk Management - arising from the negotiation or execution of this Agreement.

Explicitly not released are any and all of Plaintiffs claims for damages due to personal injury, emotional distress, or other harm related to any other claim under state or federal law Plaintiffs may have against Defendants for any conduct not alleged in the Complaint in this Action.

**Newly-Discovered Evidence:**  The Parties agree that if, after the Effective Date of this Agreement, they discover evidence different from or in addition to the evidence which they now know of or possess, this Agreement remains in full force and effect.

**Each Party is Responsible for Own Attorney Fees and Costs:**  The Parties acknowledge and agree that they are solely responsible for paying any attorney fees and costs they incurred and that neither the Parties nor their attorneys will seek any award of attorney fees or costs from the other Party, other than the amounts expressly set forth as consideration in this Agreement.

**Plaintiffs are Responsible for all Subrogation and Liens:**  Plaintiffs acknowledge that all subrogation and lien claims arising out of contract or under state or federal law-including, but not limited to, subrogation or lien claims of or related to health care providers, insurance carriers (including personal injury protection or "PIP"), workers' compensation carriers, attorneys, and any federal or state agency or programs such as Medicare, Medicaid, or Social Security-are the sole and separate obligation of plaintiffs which plaintiffs agree to pay or otherwise resolve.

Page 3 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

Plaintiffs will defend, indemnify and hold harmless the Released Parties from and against all such lien and subrogation claims brought against the Released Parties.

 **Medicare Disclaimer and Waiver:**  By signing below, plaintiffs declare under penalty of perjury that: (1) plaintiffs are not currently entitled to Medicare; and (2) none of the treatment received for the injury or injuries claimed in this Action (or related to the incident giving rise to this Action) or released in this Agreement was submitted to or paid for by Medicare.  Plaintiffs waive, release, and forever discharge Released Parties from any obligations for any claim or future claim, known or unknown, arising out of the failure of Released Parties to provide for a primary payment or appropriate reimbursement to Medicare pursuant to 42 U.S.C. § 1395y(b)(3)(A), and plaintiffs shall defend, indemnify and hold harmless the Released Parties for any claims arising out of arising out of 42 U.S.C. § 1395y(b).  Plaintiffs further understand this settlement may impact, limit or preclude plaintiffs' right or ability to receive future Medicare benefits arising out of the injuries alleged in this lawsuit.

 **No Tax Representations:**  No party warrants or represents how the United States Internal Revenue Service ("IRS"), the Oregon Department of Revenue, or other governmental authority will treat the settlement payment for tax purposes, and agree that no further payment of money from Released Parties will be due in the event that the payments or the release of the claims embodied in this Agreement or any portion thereof is found by the IRS, the Oregon Department of Revenue, or other governmental authority to be, or result in, taxable income to any party. **The Released Parties, as part of their reporting requirements, may have to communicate with the IRS, including submitting IRS form 1099.  The Released Parties reserve the right to respond to inquiries by said authorities and to make any additional disclosures requested by the governmental authority or as required by law.  Plaintiffs are solely responsible for the tax consequences of settlement payments, and plaintiffs agree not to hold the Released Parties responsible for taxes due.**

Page 4 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

**Entire Agreement:**  This Agreement, including Exhibit 1, contains and constitutes the entire agreement and understanding of the Parties, notwithstanding any and all prior negotiations, discussions, undertakings or agreements made in arriving at this Agreement.  There are no representations, agreements, or inducements between the Parties except as set forth expressly and specifically in this Agreement.  Any benefits provided to or accommodations reached with the Parties during the negotiation of this Agreement that are not described in this Agreement were made solely in the discretion of the Parties and are not part of the consideration for or the terms of this Agreement.

**No Third-Party Beneficiaries:**  Nothing in this Agreement shall convey any rights upon any person who is not a party to this Agreement.

**No Admission of Fault or Future Precedent:**  The Parties agree that this Agreement is not to be construed as an admission or proof of any liability or fault whatsoever on the part of the Released Parties.  This Agreement does not establish a precedent in the settlement of any current or future grievance, claim of unfair labor practice, or other dispute among the Parties, and shall not be admissible as evidence in any future arbitration, administrative or court proceeding except in a proceeding brought to enforce the terms of this Agreement. In the event plaintiffs pursues a claim waived or released pursuant to this Agreement, the Released Parties may plead this Agreement as an absolute defense.

**No Waiver:**  The failure by any of the Parties to enforce at any time, or for any period of time, any one or more of the terms or conditions of this Agreement or a course of dealing between the Parties, shall not be a waiver of such terms or conditions or of such Party's right to enforce each and every term and condition of this Agreement.

**Invalidity:**  This Agreement does not waive any right that may not legally be waived.  If any provision contained in this Agreement shall for any reason be held to be invalid, illegal, void, or unenforceable in any respect, such provision shall be deemed modified so as to constitute a provision conforming as nearly as possible to such invalid, illegal, void, or

Page 5 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

596868965/TIW/rrc

unenforceable provision while still remaining valid and enforceable, and the remaining terms or provisions of this Agreement shall not be affected.

**Binding Agreement and Ownership of Claims:** This Agreement shall be binding upon the Parties, and their heirs, representatives, executors, administrators, successors in interest, insurers and assigns. The Parties acknowledge that they have not transferred or assigned, or purported to transfer or assign, to any person or entity, any claim, or any portion of interest of any claim, that was or could have been raised in this Action.

**Acknowledgment of the Terms of the Agreement:** By the signatures below, the Parties acknowledge that they have read and know the contents of this Agreement, that they fully understand the Agreement's terms, and that they enter the Agreement voluntarily for the purpose of making a full compromise and settlement. Each of the Parties further represents it has consulted or has had the opportunity to consult with legal counsel of their choice concerning the legal effect of this Agreement before signing it, and that each party executes this Agreement voluntarily. Further, the persons executing and delivering the Agreement represent and warrant that they are fully authorized to do so, and that the execution of delivery of the Agreement is lawful and voluntary.

**Judgment of Dismissal with Prejudice:** The Parties agree to a dismissal of the pending Action with prejudice, without costs or fees to any party, except as explicitly set forth in this Agreement as consideration, with the Federal District Court of Oregon to retain limited jurisdiction to enforce the terms of this agreement as described below in the section "Limited Continuing Jurisdiction." Counsel for Plaintiffs shall file a Stipulation of Dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii). Additionally, counsel for defendants shall file a Notice of Settlement with a copy of this Agreement attached pursuant to ORS 17.095. The Parties agree to execute these documents and any further documents and take any further actions, as may be reasonable and necessary, in order to carry out the purpose and intent of this Agreement.

Page 6 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

**Limited Continuing Jurisdiction:**  The Parties agree that disputes regarding the payments described in the "Settlement Payment" paragraph of this Agreement or the initiation of the rulemaking process described in the "Policy Changes" paragraph of this Agreement will remain under the jurisdiction of the settlement judge, Magistrate Judge Stacie Beckerman, until the following conditions are met: (1) the payments described in the "Settlement Payment" paragraph are made, and (2) ODOC has filed a notice of proposed rulemaking with regard to the proposed policy changes in the "Policy Changes" paragraph.  The Parties agree that no other disputes are subject to the continuing jurisdiction of the settlement judge, and any continuing jurisdiction terminates upon the completion of the two foregoing conditions.

**Waiver of Rule of Construction Against Drafter:**  This Agreement was jointly drafted and approved by all Parties to this Agreement. Any rule that would otherwise require any ambiguities in this Agreement to be interpreted against the drafter(s) is hereby expressly waived.

**Counterparts:**  This Agreement may be executed in counterparts, including counterparts received by facsimile or electronic transmission, with each counterpart constituting an original. The executing Parties agree that a photocopy or other signed copy of this Agreement is as effective as the original.

**IT IS SO AGREED TO BY THE PARTIES:**


_____        DATED this _____ day of April, 2024.
**DONALD TERRILL**
Plaintiff


        Subscribed and sworn to before me this _____ day of April, 2024, in the State of Oregon, County of _____.


                                        _____
                                        Notary Public for Oregon
                                        My commission expires:_____


Page 7 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

**Limited Continuing Jurisdiction:**  The Parties agree that disputes regarding the payments described in the "Settlement Payment" paragraph of this Agreement or the initiation of the rulemaking process described in the "Policy Changes" paragraph of this Agreement will remain under the jurisdiction of the settlement judge, Magistrate Judge Stacie Beckerman, until the following conditions are met: (1) the payments described in the "Settlement Payment" paragraph are made, and (2) ODOC has filed a notice of proposed rulemaking with regard to the proposed policy changes in the "Policy Changes" paragraph.  The Parties agree that no other disputes are subject to the continuing jurisdiction of the settlement judge, and any continuing jurisdiction terminates upon the completion of the two foregoing conditions.

**Waiver of Rule of Construction Against Drafter:**  This Agreement was jointly drafted and approved by all Parties to this Agreement. Any rule that would otherwise require any ambiguities in this Agreement to be interpreted against the drafter(s) is hereby expressly waived.

**Counterparts:**  This Agreement may be executed in counterparts, including counterparts received by facsimile or electronic transmission, with each counterpart constituting an original. The executing Parties agree that a photocopy or other signed copy of this Agreement is as effective as the original.

**IT IS SO AGREED TO BY THE PARTIES:**

_____        DATED this _29th_ day of April, 2024.
**DONALD TERRILL**
Plaintiff

Subscribed and sworn to before me this ___29___ day of April, 2024, in the State of

Oregon, County of _Malheur_

OFFICIAL STAMP
KIMBERLEY D COX
NOTARY PUBLIC - OREGON
COMMISSION NO. 1043806
MY COMMISSION EXPIRES DECEMBER 28, 2027

_____
Notary Public for Oregon
My commission expires: _12-28-2027_

Page 7 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

596868965/TIW/rrc

_____    DATED this 23 day of April, 2024.
**NICHOLAS PANDO**
Plaintiff

Subscribed and sworn to before me this 23rd day of April, 2024, in the State of

Oregon, County of Umatilla

OFFICIAL STAMP
JOSE BENJAMIN PUERTA
NOTARY PUBLIC - OREGON
COMMISSION NO. 1027005
MY COMMISSION EXPIRES JULY 28, 2026

Jose Benjamin Puerta
Notary Public for Oregon
My commission expires: July 28, 2026

_____    DATED this _____ day of April, 2024.
**MICHAEL WESLEY**
Plaintiff

Subscribed and sworn to before me this _____ day of April, 2024, in the State of

Oregon, County of _____.

_____
Notary Public for Oregon
My commission expires:_____

_____    DATED this _____ day of April, 2024.
**JOE BUGHER**
Oregon Department of Corrections

Page 8 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

596868965/TIW/rrc

_____          DATED this _____ day of April, 2024.
**NICHOLAS PANDO**
Plaintiff

    Subscribed and sworn to before me this _____ day of April, 2024, in the State of

Oregon, County of _____.


_____
Notary Public for Oregon
My commission expires:_____


_____          DATED this _19_ day of April, 2024.
**MICHAEL WESLEY**
Plaintiff

    Subscribed and sworn to before me this _19_ day of April, 2024, in the State of

Oregon, County of _Lane_.


OFFICIAL STAMP
DORI JEAN MITCHELL SHOBERT
NOTARY PUBLIC - OREGON
COMMISSION NO. 1044979
MY COMMISSION EXPIRES MARCH 03, 2028

_____
Notary Public for Oregon
My commission expires: _March 3, 2028_


_____          DATED this _____ day of April, 2024.
**JOE BUGHER**
Oregon Department of Corrections


Page 8 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

596868965/TIW/rrc

_____    DATED this _____ day of April, 2024.
**NICHOLAS PANDO**
Plaintiff

       Subscribed and sworn to before me this _____ day of April, 2024, in the State of

Oregon, County of _____.

                                                           _____
                                                           Notary Public for Oregon
                                                           My commission expires:_____

_____    DATED this _____ day of April, 2024.
**MICHAEL WESLEY**
Plaintiff

       Subscribed and sworn to before me this _____ day of April, 2024, in the State of

Oregon, County of _____.

                                                           _____
                                                           Notary Public for Oregon
                                                             My commission expires:_____

_____    DATED this __29__ day of April, 2024.
**JOE BUGHER**
Oregon Department of Corrections

**APPROVED AS TO FORM:**

_____
**LYNN WALSH**, OSB #924955
Attorney for Plaintiff

DATED this ___30___ day of April, 2024.

_____
**THOMAS ZITO**, Cal. State Bar #304629
Attorney for Plaintiff
_Pro Hac Vice_

DATED this _____ day of April, 2024.

_____
**JILL CONBERE, OSB #** 193430
Assistant Attorney General
Attorney for Defendant State of Oregon

DATED this _____ day of April, 2024.

Page 9 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

596868965/TIW/rrc

**APPROVED AS TO FORM:**

_____    DATED this _____ day of April, 2024.
**LYNN WALSH**, OSB #924955
Attorney for Plaintiff


_____    DATED this ___30___ day of April, 2024.
**THOMAS ZITO**, Cal. State Bar #304629
Attorney for Plaintiff
_Pro Hac Vice_


    _s/ Tracy Ickes White_
_____    DATED this ___1st___ day of ~~April~~, 2024. (May)
~~**JILL CONBERE, OSB #** 193430~~
Assistant Attorney General
Attorney for Defendant State of Oregon
**Tracy Ickes White, OSB #**904127


Page 9 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

EXHIBIT 1

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

**291-124-0030**
**Health Evaluation and Screening**

(1)    **Health Screening at Intake:** During the admission process each AIC shall receive a baseline medical, dental, and mental health evaluation.

(a)    The medical evaluation shall consist of a physical examination and medical history including a review of available information and verification of any medication, care, or treatment requirements. The evaluation should include consideration of an AIC's potential need for eyeglasses, hearing aids, or other devices that may be necessary to perform activities of daily living or to participate in Department programs, services, or activities. The evaluation should occur within seven days of admission.

(b)    A dental screening will be performed by authorized Health Services staff within seven days of admission that includes visual examination of the teeth and gums with any obvious abnormalities or AIC complaints noted.

(i)    A baseline dental intake examination shall be completed by a fully licensed dentist within 30 days of admission to include review of the dental and medical history, charting of the teeth including identification of decayed, missing, or filled teeth, examination of the oral cavity, diagnostic X-rays (as indicated), oral hygiene instructions, access to care instructions, inquiry regarding emergent or urgent dental problems, and documentation of procedures performed in the dental record by the dentist. If there is documented evidence of an examination of the AIC's dental condition within the previous year, a dental exam is not required unless determined to be clinically necessary by the treating dentist.

(ii)    Access-to-care instructions are given such that AICs are aware of how to follow up with dental care at the receiving institution. Formal treatment plans are not provided as part of the intake examination. They are performed at the receiving institution per AIC request.

(c)    The mental health evaluation will include a screening for the presence of mental illness and suicide history. AICs who have a history of mental illness, or suicide attempts, or who report current suicidal ideations will be referred for further evaluation by a mental health treatment provider. AICs with mental illness will be housed in a facility with services appropriate for their treatment needs.

(d)    A clinical record will be initiated at the time of initial admission into the Department of Corrections.

(e)    If the AIC has a documented baseline evaluation from the department within the previous 90 days, the prior evaluation and health record is reviewed and updated as clinically necessary.

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

(f)      AICs will be informed of relevant recommendations based on the baseline health evaluations and will be provided with self-care instruction.

(2)      **Health Screening at Transfer:** A brief health screening shall be completed on all AICs received on intra-department transfers by Health Services staff at the receiving facility. This shall include review of medical, dental, and mental health records information transferred with the AIC and verification of any care or treatment requirements prearranged by the sending facility Medical Services manager. This information will be used to determine disposition of the AIC.

Statutory/Other Authority: ORS 179.040, 423.020, 423.030 & 423.075
Statutes/Other Implemented: ORS 179.040, 423.020, 423.030 & 423.075

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

**291-124-0041**
**Healthcare and Treatment**

(1)     Health care procedures will be conducted in a clinically appropriate manner by appropriately credentialed personnel in an appropriate setting.

(2)     Health care and treatment is authorized and provided according to priorities established by the Health Services Chief of Medicine and is subject to peer review. The department is not obligated to carry out any recommendations or treatment plans formulated by any outside providers if ongoing care is required. Medical care and treatment is generally prioritized into the following four levels of care and treatment:

(a)     **Level 1 Care and Treatment (Medically Mandatory Care and Treatment):** Level 1 care and treatment is defined as care and treatment that is essential to life and health, without which rapid deterioration may be an expected outcome and where medical or surgical intervention makes a very significant difference or has a very high cost-effectiveness.

(i)     Level 1 care and treatment may include, but is not limited to:

(A)     Acute problems, potentially fatal, where treatment prevents death and allows full recovery, (for example, appendectomy for appendicitis, repair of deep open wound in neck, myocarditis, myocardial infarction);

(B)     Acute problems, potentially fatal, where treatment prevents death but does not necessarily allow for full recovery (for example, burn treatment, treatment for severe head injuries, myocardial infarction); or

(C)     Maternity care (for example, monitoring, delivery, hypertension in pregnancy)

(ii)     Level 1 care and treatment is generally provided to all AICs by the department. A treating provider may authorize Level 1 care and treatment. In emergency situations, any qualified licensed DOC health professional may authorize Level 1 care and treatment.

(b)     **Level 2 Care and Treatment (Presently Medically Necessary Care and Treatment):** Level 2 care and treatment is defined as care and treatment without which an AIC could not be maintained without significant risk of either further serious deterioration of the condition or significant reduction in the chance of possible repair after release or without significant pain or discomfort.

(i)     Level 2 care and treatment may include, but is not limited to:

(A)     Chronic, usually fatal conditions where treatment improves life span and quality of life, (for example, medical management of insulin dependent diabetes mellitus, surgical treatment for treatable cancer of the uterus, medical management of asthma, hyper tension, etc.);

(B)     Immunizations;

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

(C)      Comfort care such as pain management and hospice type care for the end stages of diseases such as cancer and acquired immunodeficiency syndrome (AIDS);

(D)      Proven effective preventive care for adults, e.g., preventive dental care, mammograms, pap smears, blood pressure screenings;

(E)      Acute but non-fatal conditions where treatment causes a return to previous state of health, (for example, fillings for dental cavities, medical treatment of various infectious disorders); or

(F)      Acute non-fatal conditions where treatment allows the best approximation of return to previous health (for example, reduction of dislocated elbow, repair of corneal laceration).

(ii)      Level 2 care and treatment may be provided to AICs and, when not of an emergency nature, subject to periodic utilization review and appropriateness by the Health Services Chief of Medicine. A treating practitioner may authorize Level 2 care or treatment.

(c)      **Level 3 Care and Treatment (Medically Acceptable or Appropriate But Not Medically Necessary):** Level 3 care and treatment  is defined as care and treatment for non-fatal conditions where treatment or intervention may improve the quality of life for the AIC.

(i)      Level 3 care and treatment may include but is not limited to routine hernia repair, treatment of non-cancerous skin lesions, corneal transplant for cataract, and hip replacement.

(ii)      Level 3 care and treatment may be authorized on an individual-by-individual basis or on a case-by-case basis as follows:

(A)      Medical or surgical care and treatment that can be appropriately done on premises in a routine clinic and that is within the skills of the attending provider may be offered at the discretion of the treating provider, or may be referred by an attending provider to the Health Services Chief of Medicine for clinical review under this rule to determine whether to authorize the medical or surgical care and treatment.

(B)      Other medical or surgical care and treatment, including offsite procedures and therapies for chronic diseases may be referred to the Health Services Chief of Medicine for clinical review under this rule to determine whether to authorize the medical or surgical care and treatment.

(C)      Care and treatment described in OAR 291-124-0043 (eyeglasses),OAR 291-124-0044 (hearing aids, and OAR 291-124-0045 (durable medical equipment) may be authorized as provided in those rules.

(d)      **Level 4 Care and Treatment (Of Limited Medical Value):** Level 4 care and treatment is defined as care and treatment that may be valuable to a certain individual but is significantly less likely to be cost-effective or to produce substantial long-term gain or improvement.

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

(i)      Level 4 care and treatment may include care and treatment of minor conditions where treatment merely speeds recovery, where treatment gives little improvement in quality of life, offers minimal palliation of symptoms, or is exclusively for the convenience of the individual. Examples of Level 4 care and treatment include but is not limited to tattoo removal, minor nasal reconstruction, oral aphthous ulcers, elective circumcision, care or treatment for the common cold or infectious mononucleosis, surgery for gynecomastia.

(ii)      Level 4 care and treatment will not be routinely provided. AICs may be eligible to pay for Level 4 care and treatment as provided in OAR 291-124-0085.

(3)      **Exceptions to Levels of Care and Treatment:** The four Levels of Care and Treatment are general categories of diagnoses, therapies, or procedures. Depending on the individual circumstances, the department may consider additional factors in deciding whether to provide particular care and treatment. Also, there may be circumstances in which the level of care or treatment for a certain condition or disorder may be unclear, or in which it may not be appropriate to apply a specific level of care and treatment. In any case, a provider may refer an individual case to the Health Services Chief of Medicine for clinical review under this rule to determine whether to authorize care or treatment.

(4)      **Clinical Review:** Under appropriate circumstances, individual cases may be referred to the Health Services Chief of Medicine for clinical review. The Health Services Chief of Medicine may form a review committee (sometimes referred to as a "Therapeutic Levels of Care Committee" or "TLC Committee",) which may include one or more department providers, the Medical Services Manager, and other appropriate Department staff. The TLC Committee review care and treatment requests on a case-by-case basis, with the Health Services Chief of Medicine (or designee) as the final authority in any review. Factors that the TLC Committee may consider include, but are not limited to:

(a)      The urgency of the care and treatment, and the length of the AIC's remaining sentenced stay. Whether the care and treatment could be or could not be reasonably delayed without causing a significant progression, complication, or deterioration of the condition and would not otherwise be in clear violation of sound medical principles.

(b)      The necessity of the care or treatment, including:

(i)      Any relevant functional disability and the degree of functional improvement to be gained;

(ii)      Medical necessity, or the overall morbidity and mortality of the condition if left untreated;

(iii)      Pre-existing conditions, whether the condition existed prior to the AIC's incarceration and, if treatment was not obtained previously, the reasons for not obtaining earlier treatment;

(iv)      The probability the procedure or therapy will have a successful outcome along

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

with relevant risks;

(v)   Alternative therapy or procedures that may be appropriate;

(vi)   The AIC's desire for the procedure and the likelihood of the AIC's cooperation in the treatment efforts;

(vii)   Any known risks or benefits relative to those risks;

(viii)   Any known costs or benefits relative to those costs;

(ix)   Pain complaints or pain behaviors; and

(x)   Any other factors that are relevant or pertinent in light of the circumstances presented.

(c)   When considering whether to provide devices described in OAR 291-124-0043 (eyeglasses), OAR 291-124-0044 (hearing aids), or OAR 291-124-0045 (durable medical equipment), the TLC Committee shall consider the AIC's ability to engage in activities of daily living and ability to access programs, services, and activities of the institution.

(5)   **Therapeutic Diets:** Therapeutic diets may be ordered by a treating provider for an AIC with a medical condition requiring nutritional adjustment that is not obtainable from the regular food services menu. Diets to achieve weight loss are the responsibility of the individual AIC.

(6)   **Work Limitations:** Health Services will screen AICs for work limitations at the assignment supervisor's request. Ongoing daily review of AIC workers for symptoms of illness that would interfere with the work assignment is the responsibility of the on-site work supervisor.

Statutory/Other Authority: ORS 179.040, 423.020, 423.030 & 423.075
Statutes/Other Implemented: ORS 179.040, 423.020, 423.030, 423.075

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

**291-124-0043 Refractive Eye Examinations and Eyeglasses**

(1)     **Eye Examinations:** Health Services shall approve a refractive eye examination at least once every two years. Health Services may authorize refractive eye examinations or eyeglass purchases on a different schedule or frequency on a case-by-case basis. In making any variation or authorization, Health Services may consider the AIC's release date, past optical information, current visual acuity, and the AIC's effort and compliance with a correctional case management plan.

(2)     **Eyeglasses:** Health Services shall authorize and provide one pair of eyeglasses when clinically indicated, at state expense, at least once every two years.

(a)     AICs are responsible for routine or daily maintenance of eyeglasses provided under this rule. Health Services will provide for necessary repairs or replacement of eyeglasses. In the event an AIC misuses, alters, abuses, damages (ordinary wear and tear excepted,) or destroys a pair of eyeglasses provided under this rule, Health Services may require the AIC to incur debt or pre-pay to provide for necessary repairs or replacement. Any decision pursuant to this subsection shall be made after consulting with Behavioral Health Services, and the institution or statewide ADA coordinator, where appropriate, prior to declining to pay for a repair or replacement.

(b)     An AIC may purchase additional elective care under OAR 291-124-0085, including, eyeglasses, eyewear, eyewear accessories, or optional features for eyeglasses provided under this rule.

(3)     **Contact Lenses:** Health Services does not provide contact lens examinations. AICs may purchase contact lenses and lens solution as elective care under OAR 291-124-0085.

(4)     All healthcare provided under this rule remains subject to OAR 291-124-0041, including clinical review.

Statutory/Other Authority: ORS 179.040, 423.020, 423.030 & 423.075
Statutes/Other Implemented: ORS 179.040, 423.020, 423.030 & 423.075

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

**291-124-0044 Audiogram Examinations and Hearing Aids**

(1)    **Audiogram Examination:** Health Services, after conducting a medical evaluation to identify possible medically or surgically correctable causes of the reported hearing loss, shall refer an AIC who reports subjective hearing loss for an audiogram evaluation. Health Services shall authorize an audiogram examination and hearing aid or hearing aids for an AIC who reports subjective hearing loss that meets the requirements of Level 3 Care or Treatment under OAR 291-124-0041.

(2)    **Hearing Aids:** Health Services shall authorize and provide a monoaural hearing aid or binaural hearing aids, when clinically indicated, at least once every five years.

(a)    Health Services will provide an authorized hearing aid within sixty (60) days of that determination (subject to the availability and scheduling of any outside vendors or suppliers.) Necessary repairs or recalibration of a hearing will occur within sixty (60) days of delivery to an audiologist for repair or recalibration (subject to the availability and scheduling of any outside vendors or suppliers).

(b)    Any AIC provided hearing aids will receive at least one follow-up appointment with an audiologist within six (6) months of receiving their hearing aids (subject to audiologist availability and scheduling), and as many subsequent as are necessary to ensure the hearing aids are properly balanced.

(c)    An AIC with an authorized hearing aid shall have annual evaluations to ensure the hearing aids remain effective. If clinically indicated and appropriate, or there is a threshold shift of 10dB or more across any tested frequency, the AIC will be referred to an audiologist.

(d)    Health Services shall authorize and provide the repair or replacement of a hearing aid provided under this rule, as clinically indicated and appropriate. If an AIC's hearing aids are sent out for repairs, if practicable, the AIC will be provided with any available hearing aid substitutes, and referred to institution ADA Coordinator to ensure the AIC has necessary accommodations for effective communication.

(e)    Health Services shall authorize and provide for replacement batteries at state expense and at no cost to the adult in custody, on a schedule that is consistent with ordinary use of the hearing aid.

(f)    Health Services may decline to provide a hearing aid, repair, replacement, or battery under this rule, in the event an AIC misuses, alters, abuses, damages (ordinary wear and tear excepted,) or intentionally destroys another previously issued or approved hearing aid or hearing aid battery. Any decision pursuant to this subsection shall be made after consulting with Behavioral Health Services, and the institution or statewide ADA coordinator, where appropriate, prior to declining to pay for a repair or replacement.

(3)    All healthcare provided under this rule remains subject to OAR 291-124-0041, including clinical review.

Statutory/Other Authority: ORS 179.040, 423.020, 423.030 & 423.075

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

Statutes/Other Implemented: ORS 179.040, 423.020, 423.030 & 423.075

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

**291-124-0045**
**Durable Medical Equipment**

(1)    The following definitions apply in this rule:

(a)    "Activities of Daily Living" (or "ADLs") means activities related to personal care (including, but not limited to, tasks such as eating, toileting, grooming, dressing, and bathing,) which are necessary to maintain or improve the AIC's health.

(b)    "Durable Medical Equipment" (or "DME") means equipment that is:

(i)    furnished by a durable medical equipment, prosthetics, orthotics and supplies provider:

(ii)    primarily and customarily used to serve a medical purpose;

(iii)    generally is not useful to a patient in the absence of a medical disability, illness, or injury;

(iv)    can withstand repeated use;

(v)    can be reusable or removable; and

(vi)    is appropriate for use in any non-institutional setting in which normal life activities take place.

Examples of durable medical equipment may include prosthetic and orthotic devices, orthopedic footwear, a fitted wheelchair, or a power wheelchair that meets the criteria in this definition. This term includes supplies and accessories that are necessary for the effective use of the associated durable medical equipment. This term excludes dental equipment or devices described in the Dental Treatment and Care rule, OAR 291-124-0042.

(c)    "Orthopedic footwear" means shoes, shoe modifications, or shoe additions which are used to correct, accommodate or prevent a physical deformity or range of motion malfunction in a diseased or injured part of the ankle or foot; or to support a weak or deformed structure of the ankle or foot.

(d)    "Medically Appropriate" means that health services, items, or medical supplies that are:

(i)    Recommended by a licensed health provider practicing within the scope of their license;

(ii)    Safe, effective, and appropriate for the AIC based on standards of good health practice and generally recognized by the relevant scientific or professional community based on the best available evidence;

(iii)    Not solely for the convenience or preference of an AIC; and

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

(iv)     The most cost-effective of the alternative levels or types of health services, items, or medical supplies that can be safely and effectively provided to an AIC;

(e)     "Prosthetic and orthotic devices" means devices that replace or augment all or part of an internal body organ, including ostomy bags and supplies directly related to ostomy care and replacement of such devices and supplies. Prosthetic and orthotic devices also include leg, arm, back, and neck braces, and artificial legs, arms, and eyes, including replacements if required because of a change in the client's physical condition. This term excludes devices or items described in the Dental Care and Treatment rule, OAR 291-124-0042.

(2)     Health Services shall authorize and provide DME when clinically indicated because of a substantial functional deficit, when there is a demonstrable and substantial inability to perform activities of daily living (ADLs), or when provision of the DME may be necessary to provide access to one or more Department programs, services, or activities.

(a)     When assessing whether the provision of DME is necessary to access Department programs, services, or activities, any such assessment shall consider the disability related accessibility and functional needs of the individual requesting the DME, and shall be based on documented assessments by persons trained in disability-related functional and accessibility needs of the AIC.

(b)     Health Services may consider the following when determining whether to authorize DME:

(i)     Urgency of need;

(ii)     Time left on sentence;

(iii)     Overall necessity;

(iv)     Morbidity;

(v)     Mortality;

(vi)     Functional disability,

(vii)     Expected improvement;

(viii)     Alternatives;

(ix)     Risks and benefits;

(x)     Ability to engage in ADL and  access programs, services, and activities;

(xi)     Costs and benefits; and

(xii) Security concerns.

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

(c)    A recommendation to provide DME will be based upon the AIC's ability to function in the correctional environment with or without a proposed medical prosthesis, and as necessary to access programs, services, or activities.

(d)    The Department shall pay for DME if it meets all the criteria in this rule, including all of the following conditions:

(i)    The item is approved for marketing and registered or listed as a medical device by the Food and Drug Administration (FDA) and is otherwise generally considered to be safe and effective for the intended purpose;

(ii)    The item is reasonable and medically appropriate for the client;

(iii)    The item is primarily and customarily used to serve a medical purpose;

(iv)    The item is clinically indicated because of a substantial functional deficit, or because of a demonstrable and substantial inability to perform ADLs, or, because the Department has determined, after consultation between Health Services and the institution and statewide ADA coordinators, that the item is necessary or appropriate to provide to an otherwise qualified AIC to access Department programs, services, or activities;

(v)    The item is generally not useful to an individual in the absence of medical disability, illness, or injury;

(vi)    The item is suitable for use in any non-institutional setting in which normal life activities take place;

(vii)    The item can withstand repeated use and can be reusable or removable;

(viii)    The item is the least costly, medically appropriate item that meets the medical needs of the client; and

(ix)    The item is not otherwise excluded under this rule.

(e)    The Department may not pay for durable medical equipment when the item, or the use of the item:

(i)    Is not primarily medical in nature;

(ii)    Is for personal comfort or convenience of the client or caregiver;

(iii)    Is a self-help device;

(iv)    Is not therapeutic or diagnostic in nature;

(v)    Is not expected to significantly improve the basic health status of the AIC;

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

(vi)    Is inappropriate for client use in a non-institutional setting;

(vii)   Is for a purpose where the medical effectiveness is not supported by evidence- based clinical practice guidelines; or

(viii)  Presents a legitimate risk to the safety and security of Department facilities.

(f)     Restriction or confiscation of a medical prosthesis for any non-emergent reason (other than a medical reason) should occur with prior consultation with Health Services and the institution or statewide ADA coordinators, and when appropriate, Behavioral Health Services. Any restriction or confiscation for any emergent reason should occur, when practicable, with prior consultation with Health Services and the institution or statewide ADA coordinators, and when appropriate, Behavioral Health Services.  No DME shall be restricted or confiscated for any non-emergent reason without an individualized assessment of the AIC by the appropriate medical professional and a face-to-face discussion with the AIC to determine whether the AIC can access programs, services, and activities without the DME. This process shall be documented with the reasons why the DME was removed, and an explanation of the how the AIC will access programs, services, and activities without the DME.

(3)     The frequency of monitoring of DMEs will be determined by Health Services. Monitoring shall include review for any alterations, natural wear, destruction, or disrepair.

(4)     Health Services shall authorize and provide the repair or replacement of a DME provided under this rule, as clinically indicated and appropriate.

(5)     Health Services may decline to authorize or pay for DME, or repair or replacement of DME provided under this rule, in the event an AIC misuses, alters, abuses, damages (ordinary wear and tear excepted,) or intentionally destroys any previously issued or approved DME. Health Services will consult with Behavioral Health Services and the institution or statewide ADA coordinators where appropriate prior to declining to pay for DME or repairs or replacement.

(6)     The authorization and provision of DME under this rule is subject to clinical review as provided under OAR 291-124-0041.

Statutory/Other Authority: ORS 179.040, 423.020, 423.030 & 423.075
Statutes/Other Implemented: ORS 179.040, 423.020, 423.030 & 423.075

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

**291-124-0085**
**Charges for Elective Care or Treatment**

(1)      An AIC may request approval to purchase elective care or treatment, including a request to purchase a healthcare service from a healthcare provider in the community. The department will only approve those requests that in the department's judgment are medically appropriate and are otherwise consistent with the department's concerns for institution security and order, public safety, and sound correctional practice.

(a)      The AIC's trust account must have sufficient funds to pay for the purchase of the elective care before the requested service is scheduled or before the requested item is ordered, unless other financial arrangements have been made. The cost of elective care includes expenses associated with providing the treatment, including follow-up care, as well as all costs associated with transport and security. To obtain an elective service or item under this rule, an AIC must sign a withdrawal request form for their trust account before the Department will provide the service or item. The AIC's trust account will be charged for the estimated or actual cost of the service or item. If an AIC must pre-pay before obtaining the service or item, the AIC must sign a withdrawal request form with sufficient funds available and debited before the service or item is provided. Upon delivery of the device, any variance from the actual cost will be indebted or credited to the AIC's trust account accordingly.

(b)      For medical requests, the chief medical officer of the facility must review and approve follow-up care and treatment recommended by community providers. Any requests to purchase elective dental care from community providers must be reviewed and approved by the department's dental director.

(c)      Health Services may consider the following when determining whether to authorize an AIC to purchase a service or item, or whether an AIC must pre-pay or may incur indebtedness to obtain the service or item:

(i)      Urgency of need;

(ii)      Time left on sentence;

(iii)      Overall necessity;

(iv)      Morbidity;

(v)      Mortality;

(vi)      Functional disability;

(vii)      Expected improvement;

(vii)      Alternatives;

(viii)      Risks and benefits;

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

(ix)     Costs and benefits; and

(x)      Security concerns.

(d)      Except as provided in OAR 291-124-0041, OAR 291-124-0043 (eyeglasses), OAR 291-124-0044 (hearing aids) and OAR 291-124-0045 (durable medical equipment), an AIC is generally required to pay for elective devices that become the personal property of the AIC. An AIC is not generally required to pay for medical items that are provided for limited-term medical condition (casts, splints, ace wraps,) for short-term use (canes, crutches, or braces), or for a medically necessary procedure (heart valves, cardiac stent, inter-ocular lens implants.)

(e)      Footwear: Health Services may approve footwear that is not subject to OAR 291-124-0045, on a case-by-case basis.

(f)      Health Services may decline to authorize elective devices that are of minimal proven medical value, and authorization decisions must be weighed against safety and security concerns. Examples of items that are not generally authorized include, but are not limited to, high-top tennis shoes, soft pillows, heating pads, and knee sleeves for sports.

(g)      Items for self-care are available on the commissary list. An AIC may be advised to purchase a particular self-care item by Health Services employees. Such advice is intended as education in self-care and is not a directive that the item is considered medically necessary.

(2)   Expenses for Medical Care for AICs on Escape, Short-Term Transitional Leave, Non-Prison Leave, Parole, Post-Prison Supervision, or Emergency Leave:

(a)   Expenses incurred for healthcare of offenders on parole or post-prison supervision are the responsibility of the offender.

(b)   Expenses incurred for healthcare of AICs on escape status are not the responsibility of the department.

(c)   Expenses incurred for healthcare of AICs on short-term transition leave and non-prison leave are the responsibility of the AIC.

Statutory/Other Authority: ORS 179.040, 423.020, 423.030 & 423.075
Statutes/Other Implemented: ORS 179.040, 423.020, 423.030 & 423.075

CONFIDENTIAL SETTLEMENT COMMUNICATION PROTECTED BY FRE 408

**291-124-0110 Medication-Assisted Treatment**

(1)   Health Services may provide a form of medication-assisted treatment (MAT) to an AIC diagnosed with opioid use disorder.

(2)   Health Services may continue MAT for an AIC who has been recently admitted to DOC and who has a release date within six to thirteen months. A review committee established under this rule may consider whether to continue a form of MAT for an AIC with a release date longer than thirteen months.

(3)   Health Services may operate a program in which a form of MAT may be continued or induced for an AIC who has a release date within thirteen months. As a part of that program, a review committee established under this rule, consisting of the Chief of Medicine, the Chief of Psychiatry, and the Behavioral Health Services Administrator or their designees, may consider whether to approve a form of MAT for continuation or induction for an AIC with a release date longer than thirteen months.

Statutory/Other Authority: ORS 179.040, 423.020, 423.030 & 423.075
Statutes/Other Implemented: ORS 179.040, 423.020, 423.030 & 423.075 History: